**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF MISSISSIPPI**
**NORTHERN DIVISION**

**LIQUOR THERAPY LLC,**
**BY-PASS PACKAGE STORE, LLC,**
**JW JENNINGS LIQUOR LLC,**
**on behalf of themselves and all**
**others similarly situated,** **PLAINTIFFS**

**VS.** **CIVIL ACTION NO.** 3:26-cv-00384-CWR-LGI

**RUAN TRANSPORT CORPORATION** **DEFENDANT**

**CLASS ACTION COMPLAINT FOR DAMAGES**
**JURY TRIAL DEMANDED**

**COMES NOW** the Plaintiffs, Liquor Therapy, By-Pass Package, JW Jennings Liquor and Kats Wine & Spirits, Inc. (hereinafter "Plaintiffs" or "Class Representatives"), individually and on behalf of all others similarly situated, by and through undersigned counsel, and files this Class Action Complaint against Defendant Ruan Transport Corporation (hereinafter "Ruan" or "Defendant"), pursuant to Federal Rule of Civil Procedure 23 and the Class Action Fairness Act, 28 U.S.C. § 1332(d), and for cause of action would show unto the Court as follows:

## I. NATURE OF THE ACTION

1. This is a class action arising from the catastrophic failure of the State of Mississippi's sole alcoholic beverage warehouse and distribution operations, which Defendant Ruan Transport Corporation operates as the exclusive third-party contractor under a February 21, 2023, Contract with the Mississippi Department of Revenue ("DOR"), as amended April 1, 2025. Beginning in or about late December 2025 / early January 2026, Ruan's implementation of an incompatible warehouse management software ("WMS") system—without testing, without a contingency plan, and during peak demand season—caused the mass collapse of warehouse

throughput, the removal of three of the four conveyor belt loading lines from service, a backlog exceeding 220,000 unshipped cases by March 1, 2026, and widespread billing errors. Every Mississippi-licensed ABC permittee—a class of approximately 700 package retailers[1], was harmed in materially identical ways by Ruan's reckless conduct.

2. Plaintiffs bring this action on behalf of themselves and all similarly situated Mississippi-licensed package retailer ABC permittees who placed orders through the State's Mississippi Alcoholic Resource System ("MARS") during the Class Period and were injured by Ruan's gross negligence in operating the State's monopoly distribution system. Plaintiffs seek compensatory and punitive damages on a class-wide basis.

3. Mississippi is a control state. Miss. Code Ann. § 67-1-41 makes the State the sole wholesaler of distilled spirits and wine. Every package retailer licensed permittee in the State is required by law to purchase exclusively through the ABC warehouse, with no alternative source of supply. The class members were captive customers of a state-mandated monopoly that Ruan was contractually obligated—and legally and morally bound—to operate competently. Ruan's catastrophic failure inflicted the same injuries on every member of the class through the same operational conduct, making this case ideally suited for class treatment under Federal Rule of Civil Procedure 23(b)(3).

## II. JURISDICTION AND VENUE

4. **Subject Matter Jurisdiction.** This Court has original jurisdiction over this class action pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d)(2), because (a) the matter in controversy, aggregated across all class members, exceeds $5,000,000, exclusive of interest and costs, see 28 U.S.C. § 1332(d)(6); (b) the proposed class includes more than 100 members, see 28

---

[1] https://www.dor.ms.gov/abc/sales-and-distribution

U.S.C. § 1332(d)(5)(B); and (c) minimal diversity exists in that Plaintiffs and members of the putative class are citizens of Mississippi and Defendant Ruan is a citizen of Iowa, having been incorporated under the laws of Iowa with its principal place of business at 3200 Ruan Center, 666 Grand Avenue, Des Moines, Iowa 50309. See 28 U.S.C. § 1332(d)(2)(A). See also Plaintiffs FRCP 7.1 disclosure statement.

5. **No CAFA Exception Applies.** Neither the "home state" exception, 28 U.S.C. § 1332(d)(4)(B), nor the "local controversy" exception, 28 U.S.C. § 1332(d)(4)(A), bars the exercise of jurisdiction in this action. Both exceptions require that the primary defendant (or, for the local controversy exception, a defendant from whom significant relief is sought and whose conduct forms a significant basis for the claims) be a citizen of the State in which the action was filed. Defendant Ruan, the sole defendant in this action, is a citizen of Iowa, not Mississippi.

6. **Personal Jurisdiction.** This Court has both general and specific personal jurisdiction over Ruan. Ruan has continuous and systematic contacts with the State of Mississippi sufficient to render it essentially at home here for purposes of general jurisdiction, including operating the State's sole Liquor Distribution Center on a daily, ongoing basis since June 19, 2023; maintaining warehouse personnel and management at the Gluckstadt facility; registering to do business in Mississippi; and maintaining a registered agent for service of process within the State. This Court also has specific personal jurisdiction over Ruan because the claims of Plaintiff and the Class arise directly out of and relate to Ruan's purposeful contacts with Mississippi—namely, its operation of the ABC warehouse, its receipt of orders through DOR's MARS system from Mississippi permittees, its loading and dispatch of trucks within Mississippi, and its conduct in deploying the WMS at the Gluckstadt warehouse. Ruan is amenable to service of process pursuant to Miss. Code Ann. § 13-3-57 and Federal Rule of Civil Procedure 4(k)(1)(A) and may be served

upon its registered agent, C T Corporation System, 8927 Lorraine Rd., Suite 204-A, Gulfport, Mississippi 39503.

7. **Venue.** Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims occurred in Madison County, Mississippi, which lies within the Northern Division of the Southern District of Mississippi. The Liquor Distribution Center operated by Ruan is located in Gluckstadt, Madison County, Mississippi, and the operational failures and damages alleged herein originated at and emanated from that facility.

## III. PARTIES

8. Each Plaintiff and class member is a package retailer (often called a package store), a privately operated businesses authorized by the Department of Revenue to sell sealed and unopened alcoholic beverages exclusively for off-premises consumption. At all relevant times, they were holders of a valid Mississippi Alcoholic Beverage Control Permit and is a licensed ABC permittee authorized to purchase alcoholic beverages exclusively through the State's ABC warehouse and to sell those beverages at retail in the State of Mississippi. Plaintiff has placed and paid for orders through the MARS system during the Class Period and has suffered injuries as a direct and proximate result of Ruan's conduct alleged herein, including but not limited to undelivered, partially delivered, and late-delivered orders, and over-billing and billing discrepancies for product Plaintiff did not receive.

a. Plaintiff Liquor Therapy LLC is a Mississippi Limited Liability Company, organized and existing under the laws of the State of Mississippi, with its principal place of business at 918 Howard Ave, Biloxi, Harrison County, Mississippi 39530.

b. Plaintiff By-Pass Package is a Mississippi Limited Liability Company organized and existing under the laws of the State of Mississippi, with its principal place of business at 5344 Old Hwy 42, Hattiesburg, Forrest County, Mississippi 39401.

c. Plaintiff JW Jennings Liquor is a Mississippi Limited Liability Company organized and existing under the laws of the State of Mississippi, with its principal place of business at 17757 Hwy 49, Tutwiler, Tallahatchie County, Mississippi 38963.

9. Defendant Ruan Transport Corporation is an Iowa corporation with its principal place of business at 3200 Ruan Center, 666 Grand Avenue, Des Moines, Iowa 50309. Ruan is registered to do business in Mississippi and is the contracted third-party operator of the State's sole Liquor Distribution Center, located in Gluckstadt, Madison County, Mississippi, pursuant to a Contract for the Operation of The State Alcoholic Beverage Warehouse executed on February 21, 2023, between Ruan and the Mississippi Department of Revenue, as amended by Amendment No. 1 effective April 1, 2025 (collectively, the "Contract"). Ruan may be served with process through its registered agent, C T Corporation System, 8927 Lorraine Rd., Suite 204-A, Gulfport, Mississippi 39503.

## IV. FACTUAL ALLEGATIONS

### *A. Mississippi's State-Mandated Alcoholic Beverage Distribution Monopoly*

10. Mississippi is a "control state" in which the State government acts as the sole wholesaler of distilled spirits and wine. Miss. Code Ann. § 67-1-41 grants the Mississippi Department of Revenue sole authority to regulate and wholesale alcoholic beverages throughout the State.

11. All licensed permittees in the State of Mississippi—including but not limited to package retailers, on-premises retailers, restaurants, bars, hotels, and casinos—are required by law

to purchase their distilled spirits and wine inventory exclusively through the ABC warehouse. Permittees are statutorily prohibited from purchasing wholesale spirits or wine from any other source. Miss. Code Ann. § 67-1-41.

12. The ABC warehouse, located in Gluckstadt, Madison County, Mississippi, is the single point of wholesale distribution for all distilled spirits and wine in the State, serving every active permittee. There is no alternative source of wholesale supply. Permittees are captive customers of the State-mandated monopoly.

### *B. Senate Bill 2844 and the Ruan Contract*

13. In 2022, the Mississippi Legislature passed Senate Bill 2844 (the "Mississippi Alcoholic Beverage Control Reorganization Act"), 2022 Miss. Laws ch. 483, codified at Miss. Code Ann. § 67-1-201 et seq., which authorized DOR to contract with a third-party operator for the operations of the ABC warehouse and distribution system and required the operator to maintain a performance bond and to maintain $10,000,000 in liability insurance, with the State as additional insured. See Miss. Code Ann. § 67-1-205.

14. In response to Request for Proposals No. 3120002542 ("RFP"), DOR received four proposals and selected Ruan as the highest-scoring respondent (88 of 100 points).

15. On February 21, 2023, DOR and Ruan executed the Contract for the Operation of the State Alcoholic Beverage Warehouse. The Contract was approved by the Public Procurement Review Board at its March 2023 meeting. Ruan commenced warehouse operations on June 19, 2023.

16. The Contract has a four-year initial term with options for two additional four-year renewals, for a maximum term of twelve years. Ruan is paid on a per-case fee basis. Under the original Contract, the per-case fee was $2.22 per case in year one, $2.35 per case in year two, $2.49

per case in year three, and $2.64 per case in year four. By Amendment No. 1 effective April 1, 2025, the parties amended the per-case fee to $2.65 effective April 1, 2025 and $2.70 effective April 1, 2026. Based on annual throughput of approximately 3.7 to 4.2 million cases, the annual contract value is approximately $5.5 to $6.0 million per year. Ruan was required to post a performance bond beginning at $4,930,992 in year one and increasing 3% per year thereafter, and to maintain $10,000,000 in liability insurance with the State as additional insured pursuant to Miss. Code Ann. § 67-1-205. The Legislature's requirement that Ruan maintain a multi-million-dollar performance bond and $10,000,000 in liability coverage reflects the legislative judgment that the operational risks Ruan was assuming—and the magnitude of harm that operator failure would inflict on permittees and on the State—were foreseeable, were substantial, and required dedicated financial recourse. The very harm that the bond and insurance requirement were enacted to address has now occurred.

17. In October 2023, the Mississippi Joint Legislative Committee on Performance Evaluation and Expenditure Review ("PEER") issued Report No. 691, finding that while DOR's contract with Ruan complied with S.B. 2844, the Contract did not identify performance minimums or establish penalties for non-performance. PEER recommended that DOR establish formal performance metrics with measurable milestones.

18. PEER Report 691 documented Ruan's pre-existing performance failures, including: (a) Ruan inherited a 175,000-case backlog at the start of operations on June 19, 2023; (b) the backlog spiked to approximately 215,000 cases within the first three weeks of Ruan's operations; (c) Ruan's overall fill rate ranged between 70% and 80%, leading to between 20% and 30% of permittees' orders being cancelled; and (d) in the first 65 days of Ruan operations (June 19 through August 23, 2023), Ruan reported 20 equipment-related delays, including six delays

under 20 minutes, nine delays of 20 minutes to one hour, four delays of one to two hours, and one delay of approximately four hours, with seven additional delays attributable to Ruan's own operations.

19. PEER Report 691 further documented two facts critical to the conduct alleged in this Complaint: (a) Ruan represented to PEER that it would integrate an off-the-shelf warehouse management system known as "Blue Yonder" using "its own in-house team to work with DOR to integrate Blue Yonder with MARS"; and (b) Senate Bill 2844, codified at Miss. Code Ann. § 67-1-207, required DOR to develop and submit a Resumption-of-Control Plan to the Governor, Lieutenant Governor, Speaker of the House, the Chairmen of the Senate Finance Committee and House Ways and Means Committee, and the PEER Committee, but as of PEER's review only a "high-level draft" existed and the plan had not been submitted to the required officials. The very contingency that Senate Bill 2844 required DOR to plan for—a Ruan failure of the magnitude that has now occurred—has materialized without that planning instrument being in place.

***C. RFP Disclosures and Ruan's Pre-Bid Representations***

20. DOR's Request for Proposals No. 3120002542 expressly disclosed to Ruan and all bidders that the conveyor system at the warehouse was at end of life. RFP Amendment #2, Question #22 expressly stated: "All conveyor systems, including the conveyor operating system, are considered end of life." RFP Amendment #2, Question #41 and Attachment C to the RFP further disclosed that the Bastian Solutions software and maintenance support for the conveyor system would expire on December 31, 2024, and that remote conveyor support from Bastian Solutions would end on June 30, 2025.

21. Ruan submitted its proposal in response to RFP No. 3120002542 on or about November 18, 2022. Ruan's Proposal was signed by Marty Wadle, Ruan's Chief Commercial Officer.

22. In Section 4.1.1.2 of its Proposal, Ruan represented in writing: "Our WMS currently integrates with Bastian Solutions products for label printing, so similar integration framework would be used. We have in house integration experts to do this work and would not have to rely on outside consultants." In Section 4.1.3.5 of its Proposal, Ruan represented in writing: "Ruan does not plan on utilizing any third-party entities during the implementation start up; all the work will be done by Ruan employees and there should not be any additional costs associated with the implementation."

23. Ruan's Proposal was incorporated into the Contract as Exhibit A. Section 4.A of the Contract requires Ruan to operate "in accordance with its proposal," and Section 4.C of the Contract establishes the order of precedence as: (1) the Agreement, (2) Exhibit A (Ruan's Proposal), (3) Exhibit B, and (4) Exhibit C. Ruan's Proposal is the second-highest-priority contractual instrument and its terms are enforceable obligations of Ruan under the Contract.

***D. Ruan's Pre-Shutdown Knowledge of Operational Failure***

24. At all times relevant to this Complaint, Ruan knew that the conveyor system the RFP had disclosed as "end of life" and that Ruan had contractually assumed responsibility under Section 4.O of the Contract to maintain was at end of life and posed, in Ruan's own words, a "potential for catastrophic failure." Ruan possessed this knowledge before submitting its 2022 Proposal, at the time it executed the Contract in February 2023, throughout the period in which it operated the warehouse, and at the time it executed Amendment No. 1 in March 2025.

25. Notwithstanding Ruan's pre-bid knowledge of the end-of-life conveyor system, Ruan represented to DOR in its 2022 Proposal that it had "in house integration experts" to integrate its WMS with the existing Bastian Solutions infrastructure "without reliance on outside consultants," and that no third-party entities would be utilized during implementation. Ruan represented to PEER in 2023 that it would integrate the off-the-shelf Blue Yonder WMS with DOR's MARS system "using its own in-house team." Each of these representations was inconsistent with the operational reality Ruan was bidding to take on, and inconsistent with the conduct that ultimately occurred when Ruan deployed the new WMS in January 2026.

26. Ruan executed Amendment No. 1 to the Contract on March 6, 2025, with a DocuSign Envelope ID of E9975FA9-EF8B-4E8F-9CB5-831058D31649, adding the obligation to "implement Pick to Pallet fulfillment of orders no later than December 31, 2025," notwithstanding Ruan's knowledge that the Bastian Solutions software and maintenance support for the existing conveyor system had already expired on December 31, 2024, that remote conveyor support from Bastian Solutions would end on June 30, 2025, and that the entire conveyor system was at end of life. Ruan accepted the Pick-to-Pallet deadline knowing it would necessitate a fundamental change to the warehouse operating system on a timetable that would coincide with the height of post-holiday demand and that the existing conveyor system on which warehouse loading depended could not be relied upon to support that change.

27. Between the execution of Amendment No. 1 on March 6, 2025, and the WMS deployment in or about January 2026, Ruan did not undertake or complete adequate compatibility testing of the new warehouse management system against the existing Bastian Solutions conveyor infrastructure, did not develop or maintain a written contingency plan governing the deployment, and did not give advance notice of the planned deployment to the DOR Contract Compliance

Officer stationed at the warehouse. Throughout this period, Ruan continued to bill DOR for per-case fees under the Contract while assuming an operational risk that Ruan itself acknowledged in the Ruan Letter as a "trade-off decision" between the "downtime necessary to transition away from the obsolete conveyor system" and "the need to avoid the buildup of orders and case backlog."

***E. Ruan's Operational and Performance Obligations***

28. Under Section 4.D of the Contract, Ruan agreed to be responsible for the administrative management of warehousing, order processing, and truck loading functions, including the management of warehouse personnel.

29. Under Section 4.E of the Contract, Ruan agreed to recruit, hire, and retain sufficient qualified employees to operate the Liquor Distribution Center.

30. Under Section 4.F of the Contract, Ruan agreed to maintain a clean and dry facility; to provide 24-hour security; and to provide and maintain all required lift-truck and mobile equipment for warehouse operations.

31. Under Section 4.G of the Contract and RFP § 4.1.3.3, Ruan agreed to compile and supply DOR weekly with key performance indicators ("KPIs") for service, cost, and exceptions, including: (a) cost metrics (cost per case, cost per order); (b) productivity metrics (receiving rate per hour, pick rate per hour) measured against established goals and mis-picks; (c) inventory count accuracy by location, performed weekly using cycle counts; (d) fill rate for licensee orders, including the percentage of orders shipped complete with no item exceptions and the percentage of deliveries shipped with no exceptions; and (e) warehouse exceptions, including shortages (cases short on a delivery), overages (cases over on a delivery), and breakage/damage (measured by product value in dollars).

32. Under Section 4.H of the Contract, Ruan agreed to reimburse the MS ABC Division for all breakage and damage occurring within warehouse operations and to credit DOR for each bottle damaged in receiving, put-away, warehousing, picking, or loading.

33. Under Section 4.R of the Contract, Ruan agreed to notify DOR/ABC immediately if it became unable to materially complete services for any reason, at which point DOR could enter emergency contracts with other parties, with Ruan responsible for all additional costs.

34. Under Section 4.T of the Contract, Ruan agreed to guarantee next-workday delivery to permittees on orders entered through DOR's MARS system.

35. Under Ruan's Proposal, § 4.1.2.2, incorporated into the Contract as Exhibit A, Ruan committed that orders entered by the daily cutoff time would be processed, picked, loaded, and delivered to permittees the following business day.

36. Under Ruan's Proposal, § 4.1.3.5, incorporated into the Contract as Exhibit A, Ruan committed to implement the warehouse management system using its own internal personnel.

37. Under Section 4.O of the Contract, Ruan agreed that it was responsible for maintaining all material handling equipment in the warehouse, "including but not limited to the conveyor system, extend conveyors and sorter."

38. By Amendment No. 1 to the Contract, executed by Ruan on March 6, 2025, and by DOR on March 11, 2025, with an effective date of April 1, 2025, the parties amended the Contract to add an additional obligation: Ruan agreed to "implement Pick to Pallet fulfillment of orders no later than December 31, 2025." Amendment No. 1 also amended the per-case fee structure as set forth in Paragraph 16, supra. The Amendment expressly preserved all other terms and conditions of the original Contract.

***F. Ruan's Catastrophic WMS Deployment and the Collapse of Warehouse Operations***

39. In or about late December 2025 and early January 2026, the warehouse undertook its annual planned inventory shutdown. On or about January 13, 2026, Ruan commenced a deliberate "shutdown window" during which Ruan implemented a new warehouse management software system (the "WMS"), removed conveyor lines from service, and suspended normal warehouse operations.

40. On information and belief, the new WMS Ruan deployed in January 2026 was "Blue Yonder", the same off-the-shelf warehouse management system Ruan had represented to PEER, in the months immediately following Ruan's commencement of operations in 2023, that it would integrate with DOR's MARS system "using its own in-house team." The Blue Yonder WMS Ruan deployed was incompatible with the existing material handling equipment—specifically, the conveyor and automated sortation system identified in RFP § 4.1.3.2 as the system "currently in place in the MS ABC warehouse" and that Ruan had inherited from the prior operator. The conveyor system was the primary means of loading product onto delivery trucks. Ruan deployed the new WMS without conducting compatibility testing with the existing conveyor system.

41. As a direct and foreseeable consequence of Ruan's incompatible WMS deployment, the third-party software contractor previously providing software support for the conveyor system ceased providing those services. Commissioner Graham himself testified before the House State Affairs Committee on February 17, 2026, that "the company that was being used to provide software support for the current conveyor belt system has ceased that support, resulting in the warehouse staff switching to a slower pick and pallet system." Three of the four conveyor belt lines were taken out of service. The warehouse reverted to a dramatically slower manual "pick

and pallet" loading system. Representative Kevin Horan (R-Grenada), a member of the House State Affairs Committee, publicly characterized the conveyor system as having been "completely taken out" without an adequate backup plan.

42. Ruan deployed the new WMS during the annual inventory shutdown and immediately preceding the peak post-holiday demand period, when permittees were most dependent on reliable warehouse operations and least able to mitigate disruption. January and February are among the highest-demand periods of the year for Mississippi ABC permittees, encompassing post-New Year wholesale replenishment, Super Bowl weekend, Valentine's Day, and (for Coast retailers) Mardi Gras.

43. Ruan undertook the WMS implementation without a written contingency plan, without informing the DOR Contract Compliance Officer stationed at the warehouse, and without an operational backup plan in the event of incompatibility or failure.

44. In a written communication distributed to Mississippi ABC permittees and published publicly (the "Ruan Letter"), Ruan described its conduct in its own words. Ruan admitted: "We faced a trade-off decision between the downtime necessary to transition away from the obsolete conveyor system and the need to avoid the buildup of orders and case backlog. The selected shutdown window was intended to balance the need to complete the transition with the need to minimize order backlog." Ruan further admitted in the Ruan Letter that "attempting to repair the conveyor system and update its software would have required significant downtime, with no assurance these actions would resolve the potential for catastrophic failure," and that over the eight weeks following the shutdown, shipping volumes had to ramp from approximately 555,000 to 657,000 cases as Ruan attempted to clear the backlog it had created. Ruan further

admitted that delivery lead times and fill rates had not, as of the Ruan Letter, returned to prior levels.

45. By the time of the Mississippi House State Affairs Committee hearing on February 17–18, 2026, the warehouse had accumulated a backlog of approximately 199,000 unshipped cases. By March 1, 2026, the backlog exceeded 220,000 unshipped cases. In February 2026, the warehouse stopped accepting incoming product, further compounding the shortage.

46. Prior to the crisis, permittees including Plaintiff routinely received orders from the ABC warehouse within one to three business days of placing an order. During the Crisis Period, orders were routinely delayed by weeks. One Mississippi permittee testified before the House State Affairs Committee that an order placed on January 22, 2026, was not shipped until February 18, 2026—a delay of nearly four weeks.

47. DOR Commissioner Chris Graham testified before the House State Affairs Committee on February 17, 2026, that the warehouse "really crawled for a couple of weeks on shipping cases because of the challenges that they had with their system and getting it in place," and that systemic billing errors had occurred during the transition. Commissioner Graham acknowledged the MARS billing failure on the record, testifying: "There shouldn't be widespread billing and not receiving the product unless there's a problem that needs to be investigated." Representative Shanda Yates responded directly: "I think there is a problem." Multiple Mississippi permittees testified to billing irregularities. Anne-Marie Smith, operations manager of Raines Cellars in Flora, testified in real time that her store was charged for 35 cases but received only 5 cases. Jamie Farris, owner of Lincoln Road Package Store in Hattiesburg and leader of the Mississippi Independent Package Store Association, testified that items marked "out of stock" in MARS were nevertheless delivered, while ordered items were not—a complete inversion of

normal warehouse operations. Brandi Carter, owner of Levure Bottle Shop in Jackson testified at the same hearing that, in her words, "there are no rules anymore with the system we're currently in." Andy Graf, owner of LaVino Wine and Spirits in Tupelo, also testified to operational impact on his Northeast Mississippi business.

48. Commissioner Graham acknowledged the operational failures and asked lawmakers to forward specific cases for review. Commissioner Graham testified that the order backlog would not be cut in half before March 2026 at earliest, and would not be fully resolved until May 2026. Commissioner Graham further admitted that ABC's monthly tax collections in January 2026 totaled approximately $5 million, compared to a typical January monthly collection of approximately $10 million—a roughly 50% collapse in single-month state tax revenue directly attributable to Ruan's operational failures. House State Affairs Committee Chairman Hank Zuber opened the hearing on the public record by demanding, "How in the hell did we get here?" and went on, slamming his hands on the desk, to state: "We're not just frustrated. We're upset and mad." Representative Trey Lamar warned that Mississippi businesses would not truly recover until the new warehouse becomes operational sometime in 2027.

49. On information and belief, Ruan continued to collect per-case fees under the Contract during the entire Crisis Period, including per-case fees on cases that were never delivered to the ordering permittee, that were only partially delivered, or for which permittees were billed in excess of what they actually received.

50. On information and belief, DOR has determined that Ruan will be replaced as the operator of the State's ABC warehouse. The DOR website states that ABC "will continue to operate [the State's] liquor distribution center until a new third-party operator is selected and in place."

51. On information and belief, throughout the Crisis Period, Ruan systemically prioritized the filling of larger and bulk orders over smaller orders, and prioritized cases by item rather than by sequence of order placement, in violation of the order-fulfillment obligations governing Ruan's operations under the Contract and Ruan's Proposal. Permittees voiced this concern to PEER, reporting that Ruan placed greater priority on filling larger orders (e.g., bulk-order processing and drop shipments) than completing orders as submitted in the order placed. The result was that smaller permittees—precisely the small, family-owned retailers who comprise the bulk of the Class—were systematically deprioritized in favor of larger orders, compounding the harm of the operational collapse.

52. Plaintiff and the Class have suffered damages in the aggregate that, on information and belief, exceed $5,000,000. The damages are calculable from MARS, billing, and order-fulfillment data on a class-wide basis. By way of example only, the per-case fees that Ruan retained on cases that were never delivered or only partially delivered, computed at the Amendment 1 rate of $2.65 per case applied to the documented backlog of 220,000 unshipped cases as of March 1, 2026, is approximately $583,000—and that figure represents only the per-case fee component of damages, not lost gross profit, lost revenue, billing overcharges, mitigation costs, lost weekend and seasonal sales, or consequential damages. The scale of operational harm is reflected in DOR's own admission, made on the public record at the February 17, 2026 House State Affairs Committee hearing, that ABC tax collections in January 2026 declined to approximately $5 million as compared to a typical January monthly collection of approximately $10 million—a roughly 50% single-month collapse in tax-collected sales volume that translates directly into proportional retail-revenue losses for the Class. The harm has been compounded by the loss of Mississippi customer business to out-of-state competitors, particularly along the Louisiana border, where Mississippi

Coast retailers were unable to retain customers who turned to Louisiana stores during the Crisis Period. The aggregate damages of the Class far exceed CAFA's $5,000,000 threshold.

## V. CLASS ACTION ALLEGATIONS

### *A. Class Definition*

53. **Class Definition.** Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3) on behalf of itself and the following class (the "Class"):

> *All Package Retailer entities and persons that held a valid Mississippi Alcoholic Beverage Control Permit at any time during the Class Period and that placed one or more orders for distilled spirits or wine through the Mississippi Alcoholic Resource System (MARS) that were not delivered, were partially delivered, were delivered late, or for which Ruan billed amounts in excess of product actually delivered.*
>
> A Package Retailer holds a permit under Mississippi Code Title 67 -1-51 (b), which in pertinent part, authorizes the holder "to operate a store exclusively for the sale at retail in original sealed and unopened packages of alcoholic beverages, including native wines, native spirits and edibles, not to be consumed on the premises where sold."

The "Class Period" is defined as January 1, 2026, through the date of filing of this Complaint, with leave to amend the Class Period end-date if Ruan's operational failures continue beyond filing.

54. Excluded from the Class are: (a) Defendant Ruan and any of its officers, directors, employees, parents, subsidiaries, and affiliates; (b) the Mississippi Department of Revenue and any agency or instrumentality of the State of Mississippi; (c) the judge presiding over this action and members of his or her staff and immediate family; (d) the named plaintiffs in the action styled Calistoga Wines & Spirits, LLC, Pitts Wine & Spirits LLC, and Buckshots, LLC v. Ruan Transport Corporation, No. 3:26-cv-241-CWR-ASH (S.D. Miss.) (the "Calistoga Action"), and the named plaintiffs in the action styled Aloha Wine & Spirits, LLC, Old Rooster Holdings, LLC and Rosetti's Liquor Barrel, Ltd, NO. 1:26-CV-00098-TBM-RPM (S.D. Miss.) (the "Aloha Action") and any other Mississippi-licensed ABC permittee that has filed an individual action against Ruan arising from the conduct alleged herein and that is pending as of the date of class certification; and (e) any class member who timely opts out pursuant to Rule 23(c)(2)(B).

***B. Numerosity — FRCP 23(a)(1)***

55. The members of the Class are so numerous that joinder of all members is impracticable. On information and belief, there are approximately 700 package retailers with active Mississippi ABC permittees, every one of whom was required by law to purchase from the State's sole ABC warehouse during the Class Period and was affected by Ruan's operational failures. The class-wide scale of harm is reflected in DOR Commissioner Chris Graham's sworn legislative-hearing admission that ABC tax collections in January 2026 declined to approximately $5 million from the typical $10 million—a roughly 50% single-month collapse in the State's tax-collected alcohol-sales volume that translates directly into proportional retail-revenue losses across the Class. The proposed Class plainly exceeds the 100-member threshold of CAFA, 28 U.S.C. § 1332(d)(5)(B), and is sufficiently numerous to satisfy Rule 23(a)(1).

### *C. Commonality — FRCP 23(a)(2)*

56. There are questions of law and fact common to the Class that will generate common answers apt to drive the resolution of this litigation. The captive-customer character of the Class—every member is, by force of Miss. Code Ann. § 67-1-41, legally compelled to purchase wholesale spirits and wine exclusively through the State's sole ABC warehouse, with no alternative source of supply—means that Ruan's conduct in operating that monopoly distribution system raises questions that are universal to the Class. These common questions include, without limitation:

a. Whether Ruan, as the exclusive operator of the State's sole ABC warehouse, owed a duty of reasonable care to the Class to operate that warehouse competently;

b. Whether Ruan owed a heightened duty by virtue of its assumption of operational control over a state-mandated monopoly distribution system upon which the Class was, by law, compelled to depend with no alternative source of supply;

c. Whether Ruan breached that duty by deploying a new warehouse management system that was incompatible with the existing conveyor belt infrastructure;

d. Whether Ruan breached that duty by deploying the WMS without compatibility testing, without a written contingency plan, and without notice to the DOR Contract Compliance Officer;

e. Whether Ruan breached that duty by deploying the WMS during the annual inventory shutdown and the peak post-holiday demand period;

f. Whether Ruan breached that duty by removing three of the four conveyor belt lines from service without a viable alternative loading system;

g. Whether Ruan's conduct constitutes gross negligence under Miss. Code Ann. § 11-1-65 and supports an award of punitive damages;

h. Whether Ruan's conduct caused the backlog of unshipped cases that exceeded 220,000 units by March 1, 2026;

i. Whether Ruan's billing of permittees for undelivered or partially delivered product was systemic and resulted in unjust enrichment;

j. Whether members of the Class are intended third-party beneficiaries of the Contract between Ruan and DOR and entitled to enforce its terms;

k. Whether Class members are entitled to compensatory damages and the proper measure of those damages on a class-wide basis;

l. Whether Class members are entitled to punitive damages under Miss. Code Ann. § 11-1-65(1)(a).

***D. Typicality — FRCP 23(a)(3)***

57. Plaintiff's claims are typical of the claims of the Class. Plaintiff and every member of the Class is a Package Retailer which held a valid Mississippi ABC permit during the Class Period and were captive customers of the State's sole ABC warehouse, legally compelled by Miss. Code Ann. § 67-1-41 to purchase wholesale distilled spirits and wine exclusively through that warehouse with no alternative source of supply. Plaintiff and every Class member placed and paid for orders through MARS that were not fully or timely delivered as a result of Ruan's operational failures, and each has suffered the same kind of injury—lost product, lost revenue, lost profits, and reputational harm—arising from the same course of Ruan's conduct. Plaintiff's claims arise from the same operational failures, the same WMS deployment, the same removal of conveyor lines, and the same billing system that affected every Class member identically. The captive-customer status that Mississippi law imposed on Plaintiff is the same captive-customer status it imposed on every other Class member.

***E. Adequacy — FRCP 23(a)(4)***

58. Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs are all package retailers who suffered the same type of economic injury — lost sales, lost inventory, lost customer goodwill, and increased operating costs — as a direct result of the same distribution-system failures alleged on behalf of the Class. Plaintiffs' claims arise from the same course of conduct by Defendant, rest on the same legal theories, and seek the same categories of relief as those of absent Class members. Plaintiffs have no interests antagonistic to, or in conflict with, those of the Class, and are unaware of any unique defenses Defendant could assert against Plaintiffs that would not apply with equal force to the Class.

Plaintiffs understand the responsibilities of a class representative, including the duty to act in the best interests of absent Class members, and are prepared and willing to undertake those responsibilities, including by participating in discovery, sitting for deposition, reviewing pleadings and key filings, and assisting counsel as needed throughout this litigation.

Plaintiffs have retained Porter & Malouf, PA, counsel competent and experienced in complex commercial litigation, business tort litigation, and class actions, and counsel will vigorously prosecute this action on behalf of the Class.

***F. Predominance and Superiority — FRCP 23(b)(3)***

59. **Predominance.** Common questions of law and fact predominate over any individual questions affecting only individual Class members. The threshold liability inquiry—whether Ruan's deployment of an incompatible WMS during the peak post-holiday demand period, without testing, without a contingency plan, and without notice to DOR, constituted gross negligence under Mississippi law—is a common question that, when resolved, resolves the central liability issue for the entire Class. The factual record bearing on liability is uniform across the

Class: one warehouse, one WMS deployment, one set of conveyor failures, one common backlog, and one common billing system, harming a single state-mandated captive-customer class with no alternative source of supply. Miss. Code Ann. § 67-1-41. The class-wide nature and scale of harm is independently confirmed by Mississippi DOR Commissioner Chris Graham's February 17, 2026 testimony that ABC tax collections in January 2026 collapsed to approximately $5 million from the typical $10 million—a State-Commissioner-acknowledged 50% single-month decline in tax-collected sales volume traceable to a single common cause: Ruan's WMS deployment. The Class definition is drawn precisely to ensure that injury and liability are not individualized issues; the Class is limited to package retailer permittees whose orders were undelivered, partially delivered, late-delivered, or over-billed during the Class Period, so that membership in the Class itself establishes the fact of injury caused by Ruan's conduct. The remaining individualized damages questions—the precise dollar amount each Class member is owed—can be calculated using Ruan's and DOR's own MARS, billing, and order-fulfillment data through a common formulaic methodology and do not defeat predominance. Plaintiffs anticipate retaining a damages expert who will apply a common formulaic methodology to MARS, billing, and order-fulfillment data to calculate each Class member's damages with class-wide proof.

60. **Superiority.** A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Class members—many of them small, family-owned package stores —have damages claims that, while substantial in the aggregate, may be too small in the individual to justify the cost of separate litigation against a national transportation company with a large defense budget. Class treatment promotes judicial economy by avoiding the duplication of effort that would result from approximately 700 separate actions arising from the same operational failures, with the same defendant, the same evidence, and the same legal theories.

Plaintiffs are aware of the pending federal action *Calistoga Wines & Spirits, LLC, Pitts Wine & Spirits LLC, and Buckshots, LLC v. Ruan Transport Corporation*, No. 3:26-cv-241-CWR-ASH (S.D. Miss.) (the "Calistoga Action"), the *Aloha Wine & Spirits, LLC, Old Rooster Holdings, LLC and Rosetti's Liquor Barrel, Ltd*, NO. 1:26-CV-00098-TBM-RPM (S.D. Miss.) (the "*Aloha* Action") as well as additional individual actions filed by Mississippi ABC permittees against Ruan arising from the same conduct. The existence of these individual actions confirms that members of the proposed Class are seeking redress for Ruan's conduct, but underscores rather than undermines the superiority of class treatment: absent class adjudication, the approximately 700 affected package retailer permittees would be left to pursue (or, more likely, to abandon) parallel individual actions on identical facts and identical legal theories, multiplying the burden on this Court and on the witnesses and creating a risk of inconsistent adjudications. Class treatment is the superior method.

***G. Ascertainability***

61. The Class is readily ascertainable. The identity of every Mississippi ABC package retailer permittee during the Class Period is contained in DOR's licensing records and the records of the MARS ordering system. Each permittee's order, billing, and delivery history is fully documented in Ruan's and DOR's shared records. Class membership can be confirmed objectively from these records.

## VI. CAUSES OF ACTION

### COUNT I
### NEGLIGENCE AND GROSS NEGLIGENCE
### (On Behalf of the Class)

62. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

63. Ruan, as the sole operator of the ABC warehouse—the exclusive distribution point for all spirits and wine sold in the State of Mississippi—owed a duty of reasonable care to all Mississippi-licensed permittees, including the Class, to operate the warehouse in a competent, professional, and reliable manner.

64. This duty arose independently of any contract between Ruan and DOR. Ruan voluntarily assumed operational control of critical state infrastructure upon which every licensed permittee in Mississippi was compelled by law to depend, with no alternative source of supply. Miss. Code Ann. § 67-1-41. Where a party undertakes the operation of a state-mandated monopoly distribution system, a duty of care owed to the businesses legally dependent on that system exists by operation of law, by force of contract, and by the public policy underlying Senate Bill 2844 and Miss. Code Ann. § 67-1-41. The economic loss doctrine does not bar tort claims by non-contracting parties whose injuries arise from breach of duties imposed independent of contract.

65. Ruan breached their duty by, among other things:

a. Deploying a new warehouse management system that was incompatible with the existing conveyor belt infrastructure;

b. Failing to conduct compatibility testing of the WMS with the existing conveyor system before deployment;

c. Failing to develop or maintain any written contingency plan for the WMS deployment;

d. Failing to inform the DOR Contract Compliance Officer of the planned WMS implementation prior to deployment;

e. Removing three of the four conveyor belt lines from service without a functional replacement or alternative loading system, in direct breach of Section 4.O of the

Contract requiring Ruan to maintain the warehouse's material handling equipment, including the conveyor system;

f. Deploying the new WMS during the annual inventory shutdown and immediately before the peak post-holiday demand period;

g. Rushing the WMS deployment in an attempt to comply with the December 31, 2025, Pick to Pallet implementation deadline imposed by Amendment No. 1 to the Contract, despite the absence of compatibility testing, contingency planning, or operational readiness;

h. Failing to recruit, hire, and retain sufficient qualified employees to operate the warehouse during and after the WMS transition (Section 4.E);

i. Failing to notify DOR/ABC immediately upon becoming unable to materially complete services as required by Section 4.R of the Contract, thereby denying DOR the opportunity to enter emergency contracts to ensure that alcoholic beverages were processed and delivered to permittees;

j. Permitting a backlog exceeding 220,000 cases to accumulate before taking adequate remedial measures;

k. Continuing to bill permittees through the MARS system for product that was not delivered or only partially delivered;

l. Failing to communicate transparently or timely with the Class concerning the nature, scope, and expected duration of the service disruption.

66. **Gross Negligence — Pre-Deployment Failures.** Ruan's pre-deployment conduct alone evidences gross negligence. Ruan undertook a fundamental change to the operating system of the State's sole alcohol distribution warehouse without conducting compatibility testing

between the new WMS and the existing conveyor system; without preparing or maintaining a written contingency plan in the event of incompatibility or failure; and without informing the on-site DOR Contract Compliance Officer of the planned deployment. Ruan undertook the deployment in direct deviation from its express representation to the PEER Committee, as documented in PEER Report No. 691, that it would integrate the Blue Yonder warehouse management system using "its own in-house team."

67. **Gross Negligence — Deployment-Timing Failures.** Ruan deployed the untested, incompatible WMS during the peak post-holiday demand period when permittees were most dependent on reliable warehouse operations and least able to mitigate disruption. The deployment was driven by Ruan's rush to meet the December 31, 2025, "Pick to Pallet" deadline that Ruan itself had agreed to in Amendment No. 1, executed approximately ten months earlier on March 6, 2025—a deadline Ruan knew or should have known it could not meet through proper, tested, contingency-planned implementation. The choice to absorb a deployment failure during peak demand rather than delay deployment to ensure operational continuity reflects a calculated trade-off in which Ruan placed its own contractual deadlines ahead of the foreseeable harm to the Class.

68. **Gross Negligence — Contract-Breach Failures.** Ruan failed to invoke or comply with Section 4.R of the Contract by promptly notifying DOR that Ruan was unable to materially complete services, thereby denying DOR the opportunity to engage emergency contractors and depriving the Class of the contractually mandated emergency-procurement remedy. Ruan removed three of the four conveyor belt lines from service without a functional replacement, in direct breach of Ruan's express obligation under Section 4.O of the Contract to maintain the warehouse's material handling equipment, including the conveyor system; Representative Kevin Horan publicly characterized the conveyor system as having been "completely taken out" without an

adequate backup plan. Ruan failed to fulfill orders in compliance with the order-fulfillment sequence mandated by the Contract and Ruan's Proposal (Exhibit A to the Contract), and incorporated by reference into Ruan's statutory operational obligations under Miss. Code Ann. § 67-1-205, instead systemically prioritizing larger bulk orders and drop shipments over the orders of smaller permittees—the precise small permittees that comprise the bulk of the Class.

69. **Gross Negligence — Post-Deployment Failures and Continued Billing.** Ruan continued to bill permittees through MARS for product that was not delivered or only partially delivered—a billing failure admitted by Commissioner Graham at the February 17, 2026, House State Affairs Committee hearing and corroborated in real time by named permittees, including Anne-Marie Smith of Raines Cellars (charged for 35 cases, received 5) and Jamie Farris of Lincoln Road Package Store ("out of stock" items shipped while ordered items were not). Ruan failed to take adequate remedial measures even after the catastrophic operational consequences became known, with the result that the order backlog continued to accumulate to in excess of 220,000 cases by March 1, 2026 and that, by the State Commissioner's own admission, the backlog would not be cut in half before March 2026 and would not be fully resolved before May 2026. Ruan's conduct, taken as a whole, evidences a complete disregard for the foreseeable and devastating consequences of its actions on every Mississippi-licensed permittee, all of whom Ruan knew were captive customers of the State's sole alcohol distribution system upon which their businesses and their employees depend by force of law. Ruan's conduct constitutes gross negligence within the meaning of Miss. Code Ann. § 11-1-65, and Plaintiff and the Class will prove these facts by clear and convincing evidence.

70. As a direct and proximate result of Ruan's negligence and gross negligence, Plaintiff and every member of the Class have suffered damages capable of common formulaic

measurement from Ruan's and DOR's own electronic records. The damages include, without limitation: (a) per-case fees and product charges retained by Ruan with respect to product that was not delivered or only partially delivered, calculated as ordered cases not delivered multiplied by the contractually applicable per-case fee—an amount that, on the documented backlog of in excess of 220,000 cases at the $2.65 per-case fee in effect during the Class Period, exceeds $583,000 for the per-case fee component alone, exclusive of product charges, lost gross profit, and consequential damages; (b) lost gross profit on undelivered, partially delivered, and late-delivered orders, calculated as ordered cases not delivered (or delivered late beyond contractually required next-business-day delivery) multiplied by the permittee's ordinary retail margin per case; (c) lost weekend and seasonal sales during the peak post-holiday demand period when staple retail items were unavailable; (d) consequential damages including lost customer goodwill, customer diversion to competing businesses, and reputational harm; and (e) costs of mitigation, including increased labor and freight costs incurred attempting to fill orders, costs of carrying excess inventory (which the PEER Committee documented certain permittees were forced to maintain at three times typical levels), and costs of substituting product through bonded warehouse special orders or other available channels. The fact of injury is established by Class membership itself; the amount of injury is calculable on a class-wide basis through a common methodology applied to MARS order data, billing records, and order-fulfillment data.

71. Plaintiffs and the Class are entitled to compensatory damages and to punitive damages pursuant to Miss. Code Ann. § 11-1-65(1)(a) (gross negligence which evidences a willful, wanton, or reckless disregard for the safety of others). The factual record—including but not limited to Ruan's admitted "trade-off decision," Ruan's admitted knowledge that the conveyor system posed a "potential for catastrophic failure," Ruan's pre-bid representations to DOR that

contradicted the operational reality Ruan was bidding to take on, and Ruan's deviation from its express PEER representation that integration would be performed by Ruan's in-house team—independently supports punitive damages on the additional ground recognized by Miss. Code Ann. § 11-1-65(1)(a) (actual fraud).

**COUNT II**
**BREACH OF CONTRACT — THIRD-PARTY BENEFICIARY**
**(In the Alternative; On Behalf of the Class)**

72. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

73. In the alternative to Count I, Plaintiffs and the Class allege that they are intended third-party beneficiaries of the Contract between Ruan and DOR. Under Mississippi law, a third party may enforce a contract where (1) the contract expressly identifies the third party (or class to which it belongs) as a beneficiary; (2) the third party was within the evident intent of the contracting parties; and (3) the promisee had a substantial and articulate interest in the welfare of the third party. Each element is satisfied here. The Contract was made for the direct benefit of all Mississippi-licensed permittees, who are specifically identified as the recipients of Ruan's warehouse and delivery services, including the package retailer permittees comprising the proposed class.. The contracting parties evidently intended that permittees benefit from Ruan's performance, because permittees are by law the only entities to whom Ruan delivers product, and DOR's ability to discharge its statutory obligations to permittees depends on Ruan's performance. DOR has a substantial and articulate interest in the welfare of permittees as the regulatory body charged with ensuring lawful distribution of alcoholic beverages within the State. Miss. Code Ann. § 67-1-41.

74. Ruan breached the Contract by, among other things, the conduct identified in Paragraph 65, supra, including: (a) failure to perform its administrative management of warehousing, order-processing, and truck-loading functions (Section 4.D); (b) failure to recruit, hire, and retain sufficient qualified employees (Section 4.E); (c) failure to provide and maintain required lift-truck and mobile equipment (Section 4.F); (d) failure to compile and supply DOR with accurate weekly KPIs (Section 4.G); (e) failure to maintain the warehouse's material handling equipment including the conveyor system (Section 4.O); (f) failure to notify DOR immediately upon becoming unable to materially complete services (Section 4.R); (g) failure to guarantee next-workday delivery to permittees (Section 4.T); (h) failure to deliver orders next-business-day as committed in Ruan's Proposal § 4.1.2.2 (Exhibit A); (i) failure to implement the WMS using internal personnel as committed in Ruan's Proposal § 4.1.3.5 (Exhibit A); and (j) failure to implement Pick to Pallet fulfillment competently and on schedule as required by Amendment No. 1, § Y.

75. As a direct and proximate result of Ruan's breach, Plaintiffs and the Class have suffered damages in amounts to be proven at trial.

**COUNT III**
**UNJUST ENRICHMENT**
**(In the Alternative; On Behalf of the Class)**

76. Plaintiffs incorporate by reference all preceding allegations as though fully set forth herein.

77. In the further alternative, Plaintiffs and the Class allege that Ruan was unjustly enriched at their expense. Under Mississippi law, unjust enrichment applies where one party is in possession of money or property which in good conscience and justice it should not retain. Plaintiff and the Class placed orders through MARS and paid DOR for those orders. A portion of those

payments was remitted to Ruan as per-case fees under the Contract. Ruan retained those per-case fees with respect to product that was undelivered, partially delivered, or for which billing errors resulted in over-charges. Commissioner Graham acknowledged the systemic nature of these billing failures in his February 17, 2026, testimony. It would be inequitable for Ruan to retain those fees.

78. Plaintiffs and the Class are entitled to restitution of all per-case fees paid to Ruan with respect to product that was not delivered or only partially delivered.

## VII. PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all others similarly situated, respectfully pray that this Court enter judgment in favor of Plaintiffs and the Class and against Defendant Ruan Transport Corporation as follows:

a. An order certifying the Class pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(3); appointing Plaintiff as Class Representative; and appointing undersigned counsel as Class Counsel pursuant to Rule 23(g);

b. Compensatory damages on behalf of Plaintiff and the Class, including all lost revenue, lost profits, charges paid for undelivered goods, costs of mitigation, and harm to business reputation and goodwill, in amounts to be proven at trial;

c. Punitive damages on behalf of Plaintiff and the Class against Ruan pursuant to Miss. Code Ann. § 11-1-65(1)(a), for Ruan's gross negligence and reckless disregard for the rights and welfare of the Class;

d. Restitution and disgorgement of all per-case fees and other amounts collected by Ruan from or on account of the Class with respect to product that was not delivered

or was only partially delivered, together with all amounts billed through the MARS system in excess of product actually received;

e. Pre-judgment and post-judgment interest at the maximum rate allowed by law;

f. Reasonable attorneys' fees and costs of suit to the extent permitted by law;

g. Such other and further relief, in law or in equity, as this Court may deem just and proper.

## VIII. DEMAND FOR JURY TRIAL

Plaintiff, individually and on behalf of the Class, hereby demands a trial by jury on all claims and issues so triable, pursuant to Federal Rule of Civil Procedure 38(b).

RESPECTFULLY SUBMITTED, this 29th day of May, 2026.

**Liquor Therapy LLC, By-Pass Package Store, JW Jennings Liquor Store, Plaintiffs, individually and on behalf of the Class**

BY: */s/Timothy W. Porter*
Timothy W. Porter, MSB #9687
*Attorney for Plaintiffs and Proposed Class*

OF COUNSEL:

Timothy W. Porter, MB#9687
Patrick C. Malouf, MSB#9702
Mittie R. Field, MSB#106291
Porter & Malouf, P.A.
Post Office Box 12768
Jackson, Mississippi 39236
Telephone No.: (601) 957-1173
Facsimile No.: (601) 957-7366

Michael J. Casano, MB#10085
The Casano Law Firm, P.A.
4403 West Aloha Drive
Diamondhead, Mississippi 39525
Telephone No.: (228) 255-0035
Facsimile No.: (228) 255-0078